J-S69001-16
J-S69002-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.M.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.W., MOTHER | : | No. 649 MDA 2016 |

Appeal from the Decree March 23, 2016
In the Court of Common Pleas of York County
Orphans' Court at No:  2015-0096

| | | |
|---|---|---|
| IN THE INTEREST OF: S.E.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.W., MOTHER | : | No. 650 MDA 2016 |

Appeal from the Decree March 23, 2016
In the Court of Common Pleas of York County
Orphans' Court at No:  2015-0097

| | | |
|---|---|---|
| IN THE INTEREST OF: S.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.W., MOTHER | : | No. 652 MDA 2016 |

Appeal from the Order Entered March 24, 2016
In the Court of Common Pleas of York County
Juvenile Division at No:  CP-67-DP-0000150-2014

J-S69001-16
J-S69002-16

IN THE INTEREST OF: J.K., A : IN THE SUPERIOR COURT OF
MINOR : PENNSYLVANIA
:
:
:
:
:
:
:
:
APPEAL OF: A.W., MOTHER : No. 653 MDA 2016

Appeal from the Order Entered March 24, 2016
In the Court of Common Pleas of York County
Juvenile Division at No:  CP-67-DP-0000151-2014

BEFORE:  STABILE, DUBOW, and PLATT*, JJ.

MEMORANDUM BY STABILE, J.:                **FILED OCTOBER 17, 2016**

A.W. ("Mother") appeals from the decrees entered March 23, 2016, in the Court of Common Pleas of York County, which involuntarily terminated her parental rights to her minor daughter, S.E.K., born in November of 2009, and to her minor son, J.M.K., born in February of 2011 (collectively, "the Children").[1]  In addition, Mother appeals from the orders entered March 24, 2016, which changed the Children's permanency goals to adoption. After careful review, we affirm.

We summarize the relevant factual and procedural history of this matter as follows.  On July 22, 2014, the York County Office of Children, Youth and Families ("CYF") filed applications for emergency protective

---

* Retired Senior Judge assigned to the Superior Court.

[1] The decrees also terminated the parental rights of R.K., the Children's father.  R.K. has not filed a brief in connection with this appeal, nor has he filed his own separate appeal.

- 2 -

custody of the Children. In its applications, CYF averred that Mother was homeless, and that she and the Children had been living in a car. Application for Emergency Protective Custody (S.E.K.), 7/22/14, at 3. CYF further averred that Mother dropped the Children off at the home of their paternal grandparents on July 16, 2014, and that Mother's whereabouts were unknown. *Id.* at 4. The Children appeared to be suffering from several infected bug bites. Application for Emergency Protective Custody (S.E.K.), 7/22/14, at 3; Application for Emergency Protective Custody (J.M.K.), 7/22/14, at 3. In addition, S.E.K. appeared to be suffering from severe eczema that had not been treated. Application for Emergency Protective Custody (S.E.K.), 7/22/14, at 3.

CYF obtained orders for emergency protective custody of the Children on July 23, 2014. The orders awarded legal and physical custody of the Children to CYF, and placed the Children in the home of their paternal grandparents. CYF retained legal and physical custody of the Children pursuant to shelter care orders entered July 29, 2014. CYF filed dependency petitions on July 28, 2014, and the Children were adjudicated dependent by orders entered August 26, 2014.

On August 11, 2015, CYF filed petitions to involuntarily terminate Mother's parental rights to the Children, as well as petitions to change the Children's permanency goals to adoption. The trial court held a termination and goal change hearing on December 1, 2015, December 17, 2015, and December 29, 2015. The court convened an additional hearing on March 22,

2016, during which it announced its decision to terminate Mother's parental rights and to change the Children's permanency goals to adoption. The court entered its termination decrees on March 23, 2016, and entered its goal change orders on March 24, 2016. Mother timely filed notices of appeal from the goal change orders on April 20, 2016, along with concise statements of errors complained of on appeal. Mother timely filed notices of appeal from the termination decrees on April 21, 2016, along with additional concise statements of errors complained of on appeal.

Mother now raises the following issues for our review.

[1.] Did [CYF] fail to establish grounds for termination of Mother's parental rights under 23 Pa. C.S[.A.] [§] 2511(a)(8) in that the conditions which led to removal of the [C]hildren do not continue to exists? [*sic*]

[2.] Does termination of Mother's parental rights best serve the needs and welfare of the [C]hildren?

Mother's brief at 6 (suggested answers omitted).[2]

_____

[2] While Mother purports to appeal from the trial court's goal change orders, she does not raise any claim regarding these orders in her statement of questions involved. The argument section of her brief includes no substantive discussion of the goal change orders, nor does it contain any citation to relevant authority. Accordingly, Mother has failed to preserve any challenge to the goal change orders for our review. **See Krebs v. United Refining Co. of Pa.**, 893 A.2d 776, 797 (Pa. Super. 2006) ("We will not ordinarily consider any issue if it has not been set forth in or suggested by an appellate brief's statement of questions involved, . . . .") (citations omitted); **In re W.H.**, 25 A.3d 330, 339 n.3 (Pa. Super. 2011), *appeal denied*, 24 A.3d 364 (Pa. 2011) (quoting **In re A.C.**, 991 A.2d 884, 897 (Pa. Super. 2010)) ("'[W]here an appellate brief fails to provide any discussion of
*(Footnote Continued Next Page)*

We consider Mother's claims mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the

*(Footnote Continued)* _____

a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."').

emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(8) and (b), which provide as follows.

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8) and (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(8).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa. Super. 2003). "Notably, termination under Section 2511(a)(8)[] does *not* require an evaluation of [a parent's] willingness or ability to remedy the conditions that led to placement of her children." *In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa. Super. 2006) (citations omitted) (emphasis in original).

Instantly, the trial court found that the Children were removed from Mother's care more than twelve months prior to the filing of the termination petitions on August 11, 2015. N.T., 3/22/16, at 21. The court further found that that the conditions resulting in the Children's removal continue to exist. *Id.* at 25. The court reasoned that the Children were adjudicated dependent as a result of Mother's "pattern of poor judgment and bad decision making," and that Mother has failed to correct this pattern. *Id.* at 24. The court emphasized that Mother lacked stable housing at the time of the adjudication of dependency, and that Mother continues to lack stable housing. *Id.* at 22-24. The court found that Mother is unemployed, that she has failed to obtain a psychological evaluation, and that she does not appreciate the importance of providing the Children with appropriate medical care. *Id.* at 22, 25, 28. In addition, the court concluded that terminating Mother's parental rights would best serve the needs and welfare of the

- 7 -

Children. The court acknowledged that Mother has a bond with the Children. *Id.* at 27. However, the court found that Mother's bond with the Children "is not a positive one." *Id.* The court concluded that the Children will not suffer any long-term harm if Mother's parental rights are terminated. *Id.* at 28.

Mother argues that CYF failed to establish that her parental rights should be terminated, because she has remedied the conditions that led to the removal of the Children. Mother's brief at 13-16. Mother contends that she has acquired stable housing, attends the Children's medical appointments, no longer uses drugs, and performs well during her visits with the Children. *Id.* at 13-15. With respect to the needs and welfare of the Children, Mother contends that the Children are strongly bonded to her, and that terminating her parental rights will be detrimental to the Children. *Id.* at 18. Mother also asserts that the trial court committed an error of law by preventing her from introducing evidence concerning the Children's kinship foster parents. *Id.* at 16-17. According to Mother, the kinship foster parents were separated and divorcing at the time of the termination and goal change hearing, and the Children are now living solely with their kinship foster father, who is their paternal grandfather. *Id.* at 16. Mother alleges that the paternal grandfather suffers from "a severe case of agoraphobia," and is unable to drive more than five miles away from his home. *Id.* at 16-17.

After carefully examining the record in this matter, we conclude that the trial court did not abuse its discretion by terminating Mother's parental rights to the Children. During the termination and goal change hearing, CYF presented the testimony of the Children's caseworker, Ms. Kelly Wood. Ms. Wood testified that Mother was struggling with a host of issues at the time the Children were removed from her care. Ms. Wood explained that Mother had been residing with her grandmother, but that the grandmother kicked Mother out because "things were stolen" from the grandmother's home. N.T., 12/17/15, at 49. As a result, Mother and the Children were forced to live in Mother's car. *Id.* In addition, Mother had been a drug user "since a very early age" and was smoking "spice" and engaging in sexual encounters in front of the Children. *Id.* at 36, 74-75, 81. Mother was on probation at the time the Children were removed from her care, and was facing outstanding charges of driving under the influence and assaulting a corrections officer. *Id.* at 38. Mother was arrested on September 21, 2014, shortly after the Children were adjudicated dependent, and was incarcerated for three days on charges of public drunkenness, harassment, and disorderly conduct. *Id.* at 50.

Despite these issues, Ms. Wood testified that Mother initially made progress toward reunification with the Children. *Id.* at 43. By March of 2015, Mother was again residing with her grandmother, and had obtained employment at a gas station. N.T., 12/29/15, at 7. Mother completed a drug and alcohol evaluation and was testing negative for illegal substances.

N.T., 12/17/15, at 71; N.T., 12/29/15, at 7. Mother was participating in outpatient therapy as well as services from JusticeWorks. N.T., 12/17/15, at 71; N.T., 12/29/15, at 7. Mother even was being offered overnight visits with the Children. N.T., 12/17/15, at 64. Unfortunately, Mother's progress ground to a halt when she was arrested for stealing lottery tickets from the gas station where she was employed. *Id.* at 49-50 59-60. Mother was incarcerated from March 23, 2015, until August 23, 2015. *Id.* at 57.

Concerning the needs and welfare of the Children, Ms. Wood testified that the Children appear to share a parent/child bond with Mother "at times." *Id.* at 51. Mother and the Children are affectionate during visits, and the Children get upset when visits are over. *Id.* at 51, 85. Prior to Mother's incarceration, the Children also would become upset when Mother missed visits. *Id.* at 53. Ms. Wood initially testified that the bond between Mother and the Children is strong and positive. *Id.* at 52-53. However, Ms. Wood later testified that the Children's bond with Mother is "neutral." N.T., 12/29/15, at 20-21. Ms. Wood explained that the Children have not spent enough time with Mother to have "a good strong healthy bond," and that the Children's bond with Mother is comparable to "an aunt/uncle, niece/nephew bond." *Id.* at 29. Further, Ms. Wood stated that S.E.K.'s therapist has expressed concern regarding a possible return of S.E.K. to Mother's care. *Id.* at 40-41. Reportedly, S.E.K. was afraid "that there was not going to be electricity or heat or food, that they would be living out of the car. She was also very fearful of mom's paramour at that time when they were placed."

- 10 -

*Id.* at 41. Ms. Wood opined that terminating Mother's parental rights would likely cause the Children short-term harm, but that there would not be any long-term harm. *Id.* at 21. Ms. Wood noted that the Children had no contact with Mother for several months due to her recent incarceration, but that they did not "display any negative effects" as a result of that lack of contact. N.T., 12/17/15, at 95. To the contrary, Ms. Wood stated that the Children were "doing very, very well" during Mother's incarceration. *Id.* at 77. Ms. Wood later acknowledged that the Children did cry and ask for Mother on an unknown number of occasions while she was incarcerated. N.T., 12/29/15, at 22.

Accordingly, the record supports the finding of the trial court that the Children have been removed from Mother's care for more than twelve months, and that the conditions that led to the removal of the Children continue to exist. When the Children were first placed in CYF custody on July 23, 2014, Mother lacked housing because she stole from her grandmother. By the time CYF filed its termination petitions on August 11, 2015, Mother again lacked housing, this time because she stole from her employer and was incarcerated. While Mother initially made progress toward being reunified with the Children, Mother squandered that progress by continuing to engage in criminal activity. It was proper for the trial court

to conclude that Mother has exhibited a pattern of poor judgment and bad decision making, and that she has failed to correct that pattern.[3]

In addition, the record supports the trial court's finding that terminating Mother's parental rights would best serve the needs and welfare of the Children. The record reveals that Mother and the Children share a significant bond. Mother and the Children get along well during visits and the Children are resistant to leaving Mother when visits are over. However, it was within the court's discretion to accept the testimony of Ms. Wood that the Children's bond with Mother is more akin to "an aunt/uncle, niece/nephew bond" than to a parent/child bond, and that the Children will not suffer long-term harm if Mother's parental rights are terminated.

Finally, with respect to Mother's contention that the trial court abused its discretion by declining to hear evidence concerning the Children's kinship foster parents, we conclude that this claim merits no relief. During the termination and goal change hearing, Ms. Wood testified that the Children's kinship foster parents recently separated, and that the Children are now living solely with their paternal grandfather. N.T., 12/17/15, at 96-97.

_____

[3] We acknowledge that Section 2511(b) prohibits courts from terminating parental rights "solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S.A. § 2511 (b). Here, the relevant provision of Section 2511(b) does not apply, as the trial court did not terminate Mother's parental rights solely on the basis of environmental factors, and because Mother's incarceration for stealing lottery tickets clearly was not beyond her control.

Later during the hearing, Mother's counsel attempted to ask Ms. Wood whether the paternal grandfather has a disability. N.T., 12/29/15, at 23. Counsel for CYF objected to this question on the basis of relevance. *Id.* at 23-24. Counsel for Mother stated that the paternal grandfather suffers from agoraphobia, and that it would not be in the Children's best interest to be adopted by the paternal grandfather. *Id.* at 24. However, the trial court sustained the objection, noting that termination proceedings are often conducted in the absence of an adoptive resource. *Id.* at 24-25.

In its opinion pursuant to Pa.R.A.P. 1925(a)(2)(ii), the trial court explained that it prevented Mother's counsel from presenting additional evidence concerning the Children's paternal grandfather because "the law does not require the Trial Court to consider the nature or availability of adoptive parents in termination proceedings where the termination petition is filed by the Agency." Trial Court Opinion, 5/25/16, at 2 (citing N.T., 12/29/15, at 23-25; *In re Burns*, 379 A.2d 535 (Pa. 1977)). The court further explained that additional evidence concerning the paternal grandfather's agoraphobia would not have prevented the termination of Mother's parental rights, and that the court would have terminated Mother's rights "even if the [C]hildren had no connections with Paternal Grandparents or other caregivers." *Id.* at 2-3.

While it is true that the existence of a pre-adoptive resource is not required in order to terminate parental rights in cases where the termination petition has been filed by a child protective services agency, the trial court is

mistaken in its belief that it was not obligated to consider the nature or availability of a pre-adoptive resource for the Children. Our Supreme Court has explained that, even in cases where termination is being sought by an agency, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **T.S.M.**, 71 A.3d at 268.

Nonetheless, given the trial court's conclusion that it would terminate Mother's parental rights even in the absence of a pre-adoptive resource, it is not necessary to remand this matter for further fact-finding concerning the paternal grandfather. For the reasons already discussed, the record would support the court's decision to terminate Mother's parental rights, even if the paternal grandfather were not available to care for the Children. Had the court declined to terminate Mother's parental rights, the Children would be left to languish in foster care while Mother again attempts to achieve reunification. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **R.J.S.,** 901 A.2d at 513.

We next consider whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).[4]

As explained above, our review of record confirms that terminating Mother's parental rights will best serve the needs and welfare of the

---

[4] We observe that Sections 2511(a)(8) and (b) both require a court considering a termination petition to assess the needs and welfare of the relevant child or children. However, the needs and welfare analysis required by Section 2511(a)(8) is distinct from the needs and welfare analysis required by Section 2511(b), and must be addressed separately. *See In re C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*) ("[W]hile both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the 'needs and welfare of the child,' . . . they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).").

- 15 -

Children. While the Children share a bond with Mother, it was within the trial court's discretion to conclude that this bond is not a positive one, and that the Children will not suffer long-term harm if Mother's parental rights are terminated. Terminating Mother's parental rights will prevent the Children from languishing in foster care while Mother again attempts to achieve reunification, and, hopefully, will allow the Children to obtain permanence and stability.

Accordingly, because we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights to the Children, we affirm the decrees of the trial court. In addition, we conclude that Mother has waived any challenge to the orders changing the Children's permanency goals to adoption.

Decrees affirmed. Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/17/2016